IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

**EILEEN SISK**,                                              )
                                                             )
                              **Plaintiff,**                  )
                                                             )
**vs.**                                                      )          **CASE No. 3:11-cv-1159**
                                                             )          **Judge Campbell/Brown**
**GANNET COMPANY, INC; GANNET**                              )
**COMPANY, INC. INCOME**                                     )
**PROTECTION PLAN; and AETNA**                               )
**LIFE INS. CO., a Connecticut**
**Corporation**

                              **Defendant.**

## REVIEW AND RECOMMENDATION

Presently pending before the Magistrate Judge is the plaintiff's ("Ms. Sisk") motion for

Judgment on the Administrative Record.  (Docket Entry ("DE") 70) For the reasons set forth

below, the Magistrate Judge **RECOMMENDS** that the motion be **GRANTED in PART**,

**DENIED in PART**, and the case be remanded for a determination of Ms. Sisk's entitlement to

long term disability benefits under the Gannett plan.

## FACTS AND PROCEDURAL BACKGROUND

Eileen Sisk was employed by the Tennessean Newspaper, a publication owned by

defendant Gannett Company Inc. ("Gannett"), from April 24, 2000 until July 12, 2008, when she

first alleged disability.  (Defendant's Memorandum in Support of its Response to Motion for

Judgment on the Administrative Record ("Response"), DE 81, p. 2)  As part of its compensation

package, Gannett maintains a self-funded income protection plan ("the Plan") that includes

benefits for sick pay, as well as short term and long term disability benefits.  (AR at pp. 1124-41)

Coverage for disability under the Plan was initiated by the employee filing claims with Aetna,[1]

---

[1]     Aetna was discharged by Gannett as the claims administrator for the Plan subsequent to Ms. Sisk's complaint.

Gannett's disability claims administrator. The first five days of benefits are covered by the Plan's sick pay program. (AR at p. 1127) Thereafter, an employee is entitled to twenty-five (25) weeks of short term disability payments ("STD") followed by long term disability ("LTD") payments where a disability persists. (AR at pp. 1127-1133)

On July 14, 2008, Ms. Sisk presented to Dr. Benjamin Hill complaining of fatigue and joint pain, persisting more than one month, due to a tick bite. Dr. Hill noted physical symptoms evident of erythema migraines that were accompanied by red bites on Ms. Sisk's arms, legs, back, and feet. Dr. Hill prescribed testing for Lyme disease, steroids to aid with the itching and burning, and doxycycline due to his suspicion of Lyme disease. (AR at p. 71) In follow up on the 18th, Dr. Hill observed that target lesions persisted on Ms. Sisk's arms and legs, but many of the bites and rashes were no longer present. Dr. Hill administered a Solu-Medrol dose pack and continued Ms. Sisk on doxycycline. (AR at p. 72)

By July 30, 2008, the rash on Ms. Sisk's arms and legs was described as "a little better," but a target lesion on her right arm persisted. Ms. Sisk's temperature was recorded as 99.3 and all of her other vital signs were unremarkable. Dr. Hill noted that Ms. Sisk's fatigue persisted despite negative Lyme disease test results and certified that she be off from work under short term disability as a result.[2] At her August 14th follow up with Dr. Hill, Ms. Sisk continued to complain of fatigue and headaches. Dr. Hill's examination confirmed her complaints and revealed that the rashes and bites were no longer present. Dr. Hill released her to return to work on August 27, 2008. (AR at p. 74)

---

[2] The Magistrate Judge notes that Aetna/Gannett failed to include *any* of the physician certification forms in the administrative record other than one completed by Dr. Bertrand in November of 2008. (AR at pp. 143-44) As such, the Magistrate Judge's review of the record is limited to the physician's medical notes and letters provided "to whom it may concern." It is presumed, without deciding, that the certifications completed by Dr. Hill were no more extensive than the one completed by Dr. Bertrand.

On August 25, 2008, however, Ms. Sisk returned to Dr. Hill's office complaining of vaginal bleeding, acute aching in her legs and shoulders, and increased fatigue. Dr. Hill assessed her ailment as "probable" fibromyalgia and prescribed Lyrica to treat the symptoms. He also continued Ms. Sisk on doxycycline and referred her to a gynecologist for the vaginal bleeding. (AR at p. 75) Two weeks later, Dr. Hill noted that Ms. Sisk's fatigue and joint pain persisted. Dr. Hill documented that Ms. Sisk's concentration had improved and she was under no apparent distress. Ms. Sisk reported that she feeling better, but was still ill and the lab studies performed on September 4, 2008, revealed that her CBC and TSH levels were normal and the Lyme disease tests were all negative. (AR at pp. 76, 94) However, in a letter dated the same day, Dr. Hill stated that Ms. Sisk was still suffering fatigue and joint pain as a result of tick-borne illness, had difficulties concentrating and staying on task, he had referred her to an infectious disease specialist at Vanderbilt. (AR at p. 102)

Ms. Sisk was seen by Dr. David Haas, MD., on October 15, 2008. Dr. Hass' 12 pt. review of Ms. Sisk's symptoms were "remarkable for weight gain, fatigue, blurred vision, nasal discharge, skin rash, swollen lymph nodes, generalized muscle and joint aches and pain, and feeling 'brain fog.'" (AR at p. 104) Dr. Haas' physical exam proved unremarkable as did his review of her laboratory results. Dr. Haas observed that Ms. Sisk "present[ed] with an unusual constellation of symptoms, which may reflect [two] separate processes." Dr. Haas concluded, however, that it was "very unlikely [that Ms. Sisk's symptoms were] related to an infectious process, given the absence of fever, localized findings, abrupt onset shortly after arriving in Tennessee, and persistence over years." (AR at p. 104) Although unable to completely rule it out, Dr. Haas did not attribute her recent rash and "target lesions" to an infectious process "as they were not associated with substantial fever." (AR at p. 104) Dr. Haas informed Ms. Sisk

that her symptoms were unlikely due to Lyme disease based upon her "negative Lyme serology" and the fact that "Lyme disease is extremely infrequent in Tennessee," and referred her back to Dr. Hill.  (AR at p. 104)

Ms. Sisk returned to Dr. Hill's office on October 20, 2008, complaining of swelling in her left foot and numbness in the last two toes. Dr. Hill's exam notes reflect diagnoses of peripheral neuropathy, erythema multiform, fatigue, and planter faciitis.  (AR at p. 77)  In a letter composed the same day, Dr. Hill noted Ms. Sisk's slow recovery from Lyme disease as evidenced by "chronic symptoms of fatigue and decreased exercise tolerance since June 16." (AR at p. 108)  Despite these observations, Dr. Hill cleared Ms. Sisk to return to work on October 27th on a light duty basis—4 hours per day.  (AR at p. 108)  Dr. Hill also noted a referral to Dr. Zanolli, a dermatologist, but Dr. Zanolli's exam proved ineffective due to the fact that the red lesions and rash from which Ms. Sisk suffered initially had resolved "months ago."  (AR at p. 122)

On November 5, 2008, Ms. Sisk travelled to California to see Dr. Win Bertrand, "a specialist in Lyme disease and chronic disease syndromes."  (AR at pp. 123-44, 295)  At intake, Dr. Bertrand noted reports of bites and rashes in Ms. Sisk's medical file as he did diagnosis of erythema multiform and Ms. Sisk's reports of pain, diffuse myalgias/arthralgias, sensitivity to light and sound, pain in her shins and feet, profound fatigue, brain fog, reduced concentration and memory loss, chronic sore throat, post-exertional fatigue lasting more than 48 hours, and unrefreshing sleep.  (AR at p. 123)  Dr. Bertrand's exam revealed that Ms. Sisk was in no apparent distress, she was alert and oriented, and her vital signs were unremarkable.  Dr. Bertrand noted that she suffered from eye twitching, that he identified 12 of 18 tender points, and observed that Ms. Sisk appeared fatigued in appearance.  According to Dr. Bertrand, she was

distractible, missed words, and appeared unable to hold herself upright in her chair. (AR at pp. 123-25, 297)

Dr. Bertrand suspected chronic fatigue syndrome ("CFS") given her multi-system complaints of symptoms consistent with tick-borne illness. He ordered rheumatology, neurology, and orthopaedic workups; tests for Lyme disease, Babesia, and Bartonella; evaluation of her diet; IV vitamin and mineral drips; and heavy metal evaluation. Initially, Dr. Bertrand prescribed Levaquin, medications and supplements for Ms. Sisk's adrenal support, and treatment with orthobiotics. (AR at p. 124) After a week of treatments, Ms. Sisk reported some improvement in pain and fatigue.

On November 19, 2008, Dr. Bertrand diagnosed Ms. Sisk as suffering from chronic fatigue syndrome ("CFS"), Lyme disease, and suspected Bartonella. (AR at p. 128) During a telephonic consult on December 8, 2008, Ms. Sisk reported tenderness in her wrists, reduced eye twitching, slight improvement in shin pain, post-exertional fatigue that lasted longer than 24 hours, continued bouts of sore throat, and unrefreshing sleep. (AR at p. 129) As a result, Dr. Bertrand amended his diagnosis from CFS to chronic fatigue and immune deficiency syndrome ("CFIDS"), Lyme disease, and suspected Bartonella. (AR at p. 129)

Dr. Bertrand completed Aetna's physician certification form on November 6, 2008, stating that Ms. Sisk suffered from a chronic condition requiring treatment necessitating an absence from work from November 6, 2008, through November 5, 2009. (AR at p. 143-44) According to Dr. Bertrand, the profound disabling fatigue and cognitive impairment due to CFIDS were the underlying reasons. (AR at p. 143) Dr. Bertrand confirmed his diagnosis to Aetna in a letter dated December 10, 2008 based upon the criteria published by the Centers for Disease Control ("CDC").

Under those criteria, CFIDS is "unusual because its diagnosis does not depend upon objective laboratory or physical exam findings."  Rather, a diagnosis of CFIDS is "based entirely on subjective complaints, after excluding other recognized medical conditions."  (AR at p. 152)  Dr. Bertrand noted his observation that Ms. Sisk "appear[s] fatigued and has word finding difficulties" in conjunction with her subjective complaints and "the absence of any other medical or psychological condition that could account for" her symptoms such as normal thyroid blood work, the absence of blood dysrasias, normal complete blood count ("CBC") and erythrocyte sedimentation rate ("ESR") levels, and a normal chemistry panel.

According to Dr. Bertrand's letter, Ms. Sisk "has profound disabling relapsing fatigue lasting [longer] than 6 months not relieved by rest. She has self-reported impaired memory, myalgias, headaches, unrefreshing sleep, post-exertional fatigue and malaise lasting more than 24 hours. She has intermittent sore throat, tender lymph nodes. She has arthralgias and myalgias with no effusions."  Dr. Bertrand also noted that the results of Ms. Sisk's western blot test revealed she was positive for Lyme disease but "does not meet classic case definition for Lyme." (AR at p. 152)

Dr. Bertrand detailed his prescribed course of treatment as antibiotics for Lyme disease, nutritional supplements, graded exercise, Lunesta, and doxepin for Ms. Sisk's other symptoms. Noting a minimal clinical improvement and the effects of fatigue and pain, Dr. Bertrand assessed Ms. Sisk's functional capacity at standing for 30 minutes at a time, sitting for an hour at a time, significantly impaired concentration to a degree precluding desk work, and impaired short term memory to an extent that "would prevent adequate functioning in any kind of cognitive work." (AR at p. 153)  Dr. Bertrand's overall prognosis was "fair," but he advised that it was common for individuals with CFIDS to suffer symptoms lasting 5 to 10 years.  (AR at p. 153)

Ms. Sisk initiated her claim for STD benefits under the Plan on July 25, 2008. (AR at p. 1005) Her initial claim was denied, however, on August 15, 2008, due to Dr. Hill's failure to submit a certification form. (AR at p. 997) On August 27, 2008, after receiving Dr. Hill's certification, Aetna reinstated Ms. Sisk's STD benefits from July 12, 2008 through August 12, 2008. (AR at p. 982) On September 5, 2008, Aetna again denied Ms. Sisk's STD benefits under the Plan due to Dr. Hill's failure to update his certification of Ms. Sisk's disability. (AR at p. 977)

However, based upon Dr. Hill's letter noted *supra* at p.__, Aetna's senior nurse consultant approved extension of STD benefits through October 24, 2008. (AR at p. 980) Denise Stevenson, a claim examiner III, notified Ms. Sisk on October 29, 2008, that STD benefits were again being denied. (AR at p. 961) According to Ms. Stevenson's letter, there was a "lack of measurable examination findings and diagnostic test results" supporting her claim to STD benefits due to Dr. Hill's and Dr. Haas' failure to update her medical information. (AR at p. 961-62)

On November 11, 2008, Aetna's senior nurse consultant reinstated Ms. Sisk's STD benefits through October 30, 2008, after receiving Dr. Bertrand's certification. (AR at p. 951) The following day, Ms. Stevenson contacted Ms. Sisk by telephone to inform her that STD benefits were once again being denied. (AR at p. 947) In a follow up letter dated November 12, 2008, Ms. Stevenson stated that Ms. Sisk's STD benefits were denied due to "a lack of measurable examination findings and diagnostic test results that would substantiate an inability to perform [her] occupation as a Copy Editor." (AR at p. 947) Further, despite the detailed explanation given by Dr. Bertrand *supra* at pp. 5-7, Ms. Stevenson informed Ms. Sisk that STD benefits would be reinstated on condition that Ms. Sisk provide

a detailed narrative report for the period 10/31/2008, onward outlining the specific physical and/or mental limitations related to your condition that your doctor has placed on you as far as gainful activity is concerned; physician's prognosis, including course of treatment, frequency of visits, and specific medications prescribed;

diagnostic studies conducted during the above period, such as test results, X-rays, laboratory data, and clinical findings;

any information specific to the condition(s) for which you are claiming total disability that would help us evaluate your disability status; and any other information or documentation you think may be helpful in reviewing your claim.

(AR at p. 947)  Ms. Sisk notified Aetna of her intent to appeal the denial of her benefits on November 5, 2008.  (AR at p. 965)

Aetna referred Ms. Sisk's medical file to Dr. Nelson Zide, M.D., a practitioner in internal medicine and infectious disease, for peer review on January 23, 2009.  Dr. Zide noted that Ms. Sisk "has been followed for what appears to be chronic fatigue syndrome."  (AR at p. 294)  He also noted Ms. Sisk's treatment for Lyme disease, her complaints of "chronic severe aches and pains," reports of some fatigue "for the first time . . . on 8/14/08," the presence of "bull's eye type lesion[s] suggestive of Lyme disease," diagnosis of probable fibromyalgia, the conflicting Lyme disease test results, and the rarity of Lyme disease in Tennessee.

Dr. Zide acknowledged that Dr. Bertrand was "a specialist in Lyme disease and chronic disease syndromes" and took stock of the results of Dr. Bertrand's exam and treatment.  (AR at p. 295)  According to Dr. Zide, the methodology used by Dr. Bertrand in reaching a diagnosis of CFIDS "is how the diagnosis is normally made."    (AR at pp. 295-96)  However, Dr. Zide opined that the medical record reflected "no functional impairments from 10/31/08 through present that would preclude the claimant from performing sedentary work."  (AR at p. 296)  According to Dr. Zide's assessment, Ms. Sisk's "clinical evaluations are unremarkable with no evidence of any dysfunction;" thus, no restrictions from sedentary work [were] necessary as the result of any infectious disease."    (AR at p. 296)   Dr. Zide disregarded Dr. Bertrand's

observations and Ms. Sisk's complaints of cognitive impairment because her "letters are well written and organized . . . [s]he goes to physician appointments without difficulties and is described as being alert and oriented."  (AR at p. 296)

Despite concluding that "[a] comprehensive evaluation stressing function and results of formal cognitive testing may be helpful," Dr. Zide opined that the restrictions noted by Dr. Bertrand were inappropriate.  (AR at p. 296)  Dr. Zide conducted a peer-to-peer conference with Dr. Bertrand on February 2, 2009, at which time Dr. Bertrand cited Ms. Sisk's word finding difficulties and her inability to sit up straight during examination as evidence of her physical and cognitive disabilities.  According to Dr. Zide, Dr. Bertrand's observations were inconclusive due to a lack of "formal neuropsychological testing or Functional Capacity Evaluation."  Further, Dr. Zide noted that Ms. Sisk was "well groomed" and there was no indication in the record that she could not drive as a result of her symptoms.  (AR at p. 297)  Dr. Zide found Dr. Bertrand's opinions and observations unpersuasive and confirmed his original conclusions on February 4, 2009.  (AR at p. 297)

In pursuit of SSD, Ms. Sisk underwent a neuropsychological assessment conducted by Michael Scott M.S., and Dr. David Terrell, Ph.D.  According to Dr. Terrell's observations, Ms. Sisk was "nicely dressed . . . had no problems with ambulation . . . and [t]here was no evidence of deterioration in hygiene."  (AR at p. 183)  Further, Ms. Sisk "appeared to be consistently honest in giving information about herself and always appeared to work very earnestly and honestly in all of the skill-level test[s]."  Although Ms. Sisk "spoke in a clear and non-confused manner initially[,] . . . [s]he developed extensive cumulative fatigue as" testing proceeded.  (AR at p. 183)  Over three hours of testing, Ms. Sisk required two breaks and Dr. Terrell noted that her performance deteriorated.

Dr. Terrell observed that Ms. Sisk's response times to certain tasks were extremely prolonged, that she "had consistent difficulty with mental tracking during changes of instruction and questioning," developed "increasingly severe fatigue and disorganization in her mental processes[,] . . . became scattered when working on complex tasks . . . and demonstrated two instance[s] of thought derailment." (AR at p. 185) Further, Dr. Terrell noted that some of Ms. Sisk's errors were "certainly serious, considering her extensive news reportage and college education status." (AR at p. 186) In addition to his clinical observations, Dr. Terrell administered a battery of six psychological tests: Bender Motor-Gestalt Test; Wide Range Achievement test (4th Edition); Wechsler Adult Intelligence Scale (3rd Edition); Halstead-Reitan Neuropsychological Test Battery: Trail-Making Test—parts A and B, Booklet Category Test; House-Tree-Person Projective Drawings; and Draw-an-Animal Test.

As to intellectual functioning, Dr. Terrell reported

[t]esting with the Wechsler Adult Intelligence Scale yielded a Verbal IQ of 111, a Performance IQ of 92 and a Full Scale IQ of 100. She certainly attempted to do her best in each of these test subsections so these scores are considered valid. There is a 95% confidence that her Full Scale IQ does fall between 96 - 104. Her Full Scale IQ and performance IQ fell in the average range (IQ 90-109). Her Verbal IQ fell in the above average range (IQ 110-119). Her Verbal Comprehension index was 118, within the high average range. And her Perceptual Organization Index (POI) was 93, in average range. These summary scores knit together and [are] internally consistent. She displayed some variations in skill level illustrating the impact of depression and anxiety upon specific skills.

(AR at p. 183)

Dr. Terrell opined of Ms. Sisk's individualized test scores that:

[s]he scored in the superior range in many of the core scale areas which would be quite consistent with her successful previous career as a writer and editor (i.e. vocabulary, recognition of similarities among dislike items and concepts, digit span, and information). Her comprehension score was average. She scored in the low-average range in recognition of essential missing picture details and the digit symbol-coding (where eye-hand coordination and speed and accuracy of visual scanning performance betrayed impairment in her Visual-Spatial Organization and ability to quickly grasp details in her surrounding environment). These

relative poor scores suggest she would develop fatigue in working with detailed written or visual information. This is precisely what occurred during the process of this examination.

Her verbal sum of scaled scores was 71. The Performance sum of scaled scores was 45. The discrepancy between the summed scores certainly suggests a pattern of underlying learning disability or organic impairment. There is clearly no history of learning disorder in this woman's past.

(AR at p. 184)

Achievement screening revealed that Ms. Sisk's reading, math, and spelling abilities were within normal range and reflected college-level ability. The neuropsychological screening measurements administered by Dr. Terrell indicated skills within the average range except in two areas. According to Dr. Terrell, Ms. Sisk's Total Error Score of 56 and her timed responses on the Trail Making Test—48 seconds for Part A and 91 seconds for Part B—are "within the mild neuropsychological impairment range." (AR at p. 184) Based upon his observations and formal testing, Dr. Terrell diagnosed Ms. Sisk as suffering from Dysthymic disorder, cognitive disorder, and borderline personality disorder. Dr. Terrell assessed her Global Assessment of Functioning at 46[3] and that her ability to perform in a professional capacity is severely impaired. (AR at pp. 197-98) Dr. Terrell's assessment was transmitted to Aetna on July 24, 2009. (AR at p. 199)

Dr. Bruce A. Davis, a Social Security Administration consulting physician, also evaluated Ms. Sisk on September 15, 2009. (AR at pp. 202-09) Like Dr. Bertrand, Dr. Davis concluded from Ms. Sisk's medical record, subjective complaints, unremarkable blood chemistry, and his own examination that Ms. Sisk suffered from CFS/CFIDS. Despite no loss in physical mobility and the lack of objective medical evidence regarding cognitive deficiency, Dr.

---

[3]   Global Assessment of Function is "a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 502 n.7 (6th Cir. 2006). A GAF score in the range of 40-50 represents serious symptoms resulting in marked difficulty, and a score in the range of 50-60 represents moderate symptoms. *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders p. 32 (4th Ed. 1994)

Davis opined that the severity of Ms. Sisk's symptoms would "prevent [her from] performing regular, sustained occupational activities" due to weakness, fatigue, impaired memory and concentration. Further, Dr. Davis concluded that Ms. Sisk's condition was chronic and would necessitate four or more absences from work monthly. (AR at p. 206) Dr. Davis' report was forwarded to Aetna on September 29, 2010. (AR at p. 210)

Dr. Mark Watson, an SSA consulting expert, concluded from his examination of Ms. Sisk that she suffered from CFS rather than CFIDS. (AR at p. 285) However, according to the SSA's attorney advisor who approved Ms. Sisk's SSD benefits, Dr. Watson's assessment of Ms. Sisk's symptoms and functionality was "consistent with the other medical evidence," such as the opinion of Dr. Bertrand and Dr. Davis. (AR at p. 286) The SSA's favorable ruling was transmitted to Aetna on April 26, 2010. (AR at p. 287)

On June 14, 2010, Aetna requested a peer review of Ms. Sisk's medical file by Elana Mendelssohn, Psy.D. Dr. Mendelssohn concluded from her assessment of the record alone there was insufficient evidence to "clearly substantiate the presence of a functional impairment from a neuropsychological perspective from 10/31/08 through 1/09/09." The basis of her conclusion was the lack of "formal measures of symptom validity, memory, language, visual-spatial ability, or executive functioning." (AR at p. 532) Dr. Mendelssohn noted Ms. Sisk's "history of cognitive and emotional difficulties; her subjective complaints regarding memory, cognitive function and fatigue; and Dr. Terrell's observation that she suffered from "cumulative fatigue" during testing. However, she discounted Dr. Terrell's observations and conclusions due to his failure to include "symptom validity measures and to insure valid tests results and to rule out" malingering on Ms. Sisk's part. (AR at p. 530)

Dr. Mendelssohn also noted Ms. Sisk's full scale IQ of 100 and her average or above average performance in verbal and non-verbal abilities, but discounted reports of "mild impairment on tasks of cognitive flexibility and sequencing" because Ms. Sisk's "performance fell well within the average range" on "several timed tasks of intellectual functioning."  (AR at p. 530)  As to Dr. Terrell's conclusions that Ms. Sisk "would have difficulty retaining information from the complex instructions and meeting deadlines," Dr. Mendelssohn found no evidence of "specific test findings documenting impairment in this realm . . . [or] indication that she had difficulty recalling test instructions."  (AR at p. 531)

Likewise, Dr. Mendelssohn discounted both Dr. Terrell's opinions regarding Ms. Sisk's "limitations in terms of social interaction, sustained concentration and persistence" and Dr. Davis' conclusion that Ms. Sisk suffered from memory and concentration impairments. According to Dr. Mendelssohn, neither physician included "specific measurement of" Ms. Sisk's cognitive abilities that would substantiate such limitations.  (AR at p. 531)  Further, neither physician included a "description of direct and observed behaviors to corroborate the presence of impairment in emotional or behavioral functioning."  (AR at p. 531)  Dr. Mendelssohn did not perform a peer-to-peer consultation with any of Ms. Sisk's treating physicians.  (AR at p. 531)

Aetna requested a peer review from Dr. Tamara Bowman, MD., an internal medicine and endocrinology specialist, on June 14, 2010.  (AR at pp. 512-24)  According to Dr. Bowman, "[t]here [we]re insufficient clinical findings documented and obtained from" her initial review and peer-to-peer conference to support any functional impairment "from an internal medicine standpoint."  (AR at p. 520, 522)  After summing up Ms. Sisk's relevant history, Dr. Bowman noted Ms. Sisk's negative test results for Lyme disease and the unlikelihood that she could

contract the disease in Tennessee. Despite Dr. Bertrand's diagnosis of CFIDS, Dr. Bowman concluded that "diagnosis does not equate to disability." (AR at p. 521)

The basis of Dr. Bowman's contrary conclusion was the lack of

documentation of muscle weakness (except a reduced hand grip bilaterally on one occasion) focal sensory exam findings, (except for numbness in the left 4th and 5th toes, which would not preclude performance at a sedentary physical demand level); abnormal gait, requirement for assistive devices, quantifiable deficits, and range of motion, abnormal reflexes, cerebellar exam abnormalities, joint deformity or effusion, or signs of synovitis. There is no documentation of positive serologic markers of inflammation. There is no evidence of Lupus or other connective tissue disease, rheumatoid arthritis, or other inflammatory arthropathy

(AR at p. 521)

Dr. Bowman found additional support in her own conclusion that the "limitations noted [by Dr. Davis during his consultative exam] are compatible with performance at a sedentary physical demand level on a full-time basis." (AR at p. 521) Dr. Bowman conducted a peer-to-peer consultation with Dr. Hill on June 14, 2010, that was unremarkable. She was unsuccessful in contacting Dr. Bertrand. (AR at p. 520) On November 16, 2010, Dr. Bowman updated her initial assessment after receiving additional information from Ms. Sisk that included a taped interview detailing the impact of fatigue on Ms. Sisk's work and life activities. (AR at p. 1024) However, Dr. Bowman "defer[red] to the peer review consultant in neuropsychology regarding" cognitive limitations and affirmed her initial assessment based upon the lack of a positive Lyme titer or direct evidence physical impairment. (AR at p. 1246)

Aetna notified Ms. Sisk on December 8, 2010, that the initial decision to deny her STD benefits under the Plan was being upheld. (AR at p. 895) According to Aetna and its experts, there was "a lack of clinical findings to support Ms. Sisk's inability to perform the material duties of her own occupation." (AR at p. 899) As part of its determination, Aetna dismissed the favorable SSA ruling because

[Aetna's] disability determination and the SSD determination are made independently and are not always the same. The difference between our determination and the SSD determination may be driven by the Social Security Administration (SSA) regulations. For example, SSA regulations required that certain disease/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to SSD Benefits. Therefore, even though your client is receiving SSD benefits, we are unable to give it significant weight in our determination, and we find that your client is not (sic) longer eligible for STD benefits based on the plan definition of Disability and Disabled, quoted above.

Ms. Sisk filed the instant complaint in federal District Court for the Middle District of Tennessee on December 7, 2011, seeking review of Aetna's denial of her benefits under 29 U.S.C. § 1132(e). (DE 1 at p. 1) According to Ms. Sisk, Aetna's treatment of her claim was arbitrary and capricious and the unfavorable ruling is not supported by substantial evidence. (DE 1 at p. 2) As such, Gannett is liable to her for both the STD and LTD benefits she was wrongfully denied. (DE at p. 6) Gannett answered Ms. Sisk's complaint on February 8, 2012. (DE 11) Aetna filed its answer to the complaint on February 9, 2012, asserting, *inter alia*, that it was solely "the claims administrator and delegate of the plan administrator." (DE 13 at p. 1)

By order dated October 10, 2012, the District Judge dismissed Aetna from the suit by consent of the parties. (DE 52) On November 5, 2013, Ms. Sisk filed the instant motion for judgment on the administrative record. (DE 70) Gannett responded on November 19, 2013 (74), to which Ms. Sisk filed reply on January 23, 2014. (DE 88)

This matter is properly before the court.

## ANALYSIS

### I. STANDARD OF REVIEW

As with any issue pertaining to an employee benefit plan governed by ERISA, the terms of the Plan govern. *See U.S. Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1548 (2013) (relying on *Curtis-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995)). In this context, however, the

appropriate standard of review is determined not by the express terms of the plan document, but, rather, implicitly by the amount of discretion vested within a fiduciary or plan administrator. *See Firestone Tire & Rubber Co, v. Bruch*, 489 U.S. 101 (1989). Where no discretionary authority resides with the fiduciary body tasked with administering the plan, a denial of benefits is subject to *de novo* review. *Id.* at 105.

Where "the plan gives the administrator or fiduciary discretion 'to determine eligibility for benefits or to construe the terms of the plan," deference is due that determination. *Whisman v. Robbins*, 55 F.3d 1140, 1143 (6th Cir. 1995) (quoting *Firestone*, 489 U.S. at 103). In these cases, courts are required to "uphold the administrator's decision if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence," i.e. not arbitrary and capricious. *Glen v. MetLife*, 461 F.3d 660, 666 (6th Cir. 2006) *aff'd by* 554 U.S. 105 (2008) (internal quotation marks and citations omitted)). While this standard is deferential, it is not "merely [a] rubber stamp [on] the administrator's decision." *Id.* (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)).

In her bid for *de novo* review, Ms. Sisk concedes that the Plan grants "full discretionary authority to control and manage the operation of the plan to the Benefit Plan Committee and anticipates that the Committee will delegate that authority to an insurance company or similar organization." (Motion at p. 40) However, according to Ms. Sisk's argument, "the AR does not contain any document whereby defendants delegated anything, much less discretionary authority, to Aetna." (Motion at p. 63) Thus, Gannett is not entitled to deference in the decision to deny her claim to benefits, and *de novo* review is appropriate here. (Motion at pp. 42-44, 63)

Gannett responds that the terms of the Plan grant full discretionary authority to the Plan Administrator; thus, under the reasoning advanced in *Firestone*, an arbitrary and capricious

standard is appropriate. (Response at p. 18.) However, Gannett never squarely addresses Plaintiff's argument that Aetna was not the Plan Administrator. Rather, in a footnote, Gannett asserts that Ms. Sisk alleges in her complaint that Aetna is the plan Administrator, Aetna's letters to Plaintiff "indicate that claims under the Gannett Co., Inc. Plan are administered by Aetna," and that "Plaintiff never questioned Aetna's authority" as the claims administrator. (Response at p. 18 n. 3.) Gannet's argument is patently frivolous.

Gannett bears the burden of proof as to its delegation of Plan Administration authority to Aetna. *See Clark v. Metropolitan Life Ins. Co.*, No. 94-3840 1995 U.S. App. LEXIS 35940, *9 (6th Cir. 1994) (citing *Brown v. Ampco-Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir. 1990)). The Plan itself requires Gannett to clearly express the delegation in the Supplemental Plan Document (AR at p. 1136), as does ERISA. 29 U.S.C. § 1022(b). Further, binding precedent in this circuit holds that "a clear grant of discretion to determine benefits or interpret the plan" is required to warrant deference. *Wulf v. Quantum Chem. Corp.*, 26 F.3d 1368, 1373 (6th Cir. 1994). Moreover, Aetna claims no other responsibility other than that of "the claims administrator and delegate of the plan administrator" as noted *supra* at p. 15.

Thus, because an "unauthorized body that d[id] not have fiduciary discretion to determine benefits eligibility render[ed] the decision" in Ms. Sisk's case, Gannett is deprived of the deferential arbitrary and capricious standard of review. *Sanford v. Harvard Indus.*, 262 F.3d 590, 597 (6th Cir. 2001); accord, *Rodriguez-Abreu v. Chase Manhattan Bank, N.A.*, 986 F.2d 580, 584 (1st Cir. 1993) (affirming district court's application of *de novo* review when a body other than the one named in the plan made benefit eligibility determinations). Nevertheless, even under a deferential standard of review, Aetna's denial of Ms. Sisk's STD claim was not the "result of a deliberate, principled reasoning process." *Glenn*, 461 F.3d 666.

## II. DENIAL OF MS. SISK'S STD BENEFITS

The question presented is whether Aetna's consideration of all relevant factors resulted in a denial of benefits that is "rational in light of the plan's provisions." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (quoting *Jones v. Metro Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004)). Ms. Sisk asserts that Aetna's decision to deny her claims was not. According to Ms. Sisk, Aetna's extra-contractual requirement that she prove her disability through "measurable examination findings and diagnostic test results" eliminated consideration of her subjective complaints and resulted in termination of her STD benefits without any appreciable improvement in her medical condition. (Motion at pp. 64-68.)

Further compounding this error is Gannett's discount of the professional opinion of Ms. Sisk's treating physician and the favorable social security ruling that found her completely disabled. (Motion at pp. 64-68.) Moreover, because the Plan anticipates STD benefits rolling over into LTD benefits where a participant suffers from a lingering disability, Aetna's denial of her STD benefits constitutes a *de facto* denial of her LTD claims. (Motion at pp. 64-68.) As recompense, Ms. Sisk demands payment of "all outstanding benefits," and any other relief to which she is entitled under ERISA, denied her by Aetna's arbitrary and capricious treatment of her claim. (Motion at p. 68.)

According to Gannet, however, the requirement that Plaintiff provide proof of her disability is not an "extra-contractual requirement" under Sixth Circuit precedent, their reliance on the opinions of "independent reviewing physicians" in denying Ms. Sisk's disability claim is reasonable, and a favorable SSD finding is not controlling in the present context. (Response at pp. 19-20, 22-23.) As to Mr. Sisk's demands for LTD benefits, Gannett argues that she never applied for LTD benefits, and, thus, is not entitled to them. (Response at pp. 23-25.)

**A. Aetna imposed an extra-contractual requirement on Ms. Sisk to prove her disability through objective medical evidence.**

As noted *supra* at p. 7, Ms. Sisk's claim to STD benefits was denied on November 11, 2008. (AR at p. 961) According to the notice provided, she "no longer me[t] the definition of disability" due solely to the lack of "measurable examination findings and diagnostic test results that would substantiate an inability to perform [her] own occupation as a Copy Editor II." (AR at p. 947.) Ms. Sisk asserts that the Plan's terms do not require her to submit objective evidence substantiating her disability, and, thus, Aetna arbitrarily imposed an extra-contractual requirement in order to deny her STD claim. (Motion at p. 64.)

In response, Gannett relies on *Cooper* for the proposition that "[r]equiring a claimant to provide objective medical evidence of disability is not irrational or unreasonable.").[4] *Id.* at 166. Gannett's reading of *Cooper* sweeps much too broadly, however. At issue in *Cooper* were LTD benefits under the terms of an insured disability plan as opposed to the self-funded plan under consideration here. *Id.* at 159. The *Cooper* plan expressly required the claimant to proffer "satisfactory proof of Disability before benefits" were paid, and incorporated by reference all of the supplementary "terms and conditions of the" underwriter's insurance policy. *Id.* In stark contrast here, the plain language of Gannett's STD plan imposes no analogous requirement.

Under the terms of the Plan, a STD exists:

> when the participant is not able to perform the material duties of his or her own occupation solely because of an illness, injury or accident (including alcoholism, drug addiction and mental illness) that requires the participant to be absent from work for more than five consecutive work days. The absence must be certified by a provider whose specialty or expertise in his or her regular area of practice includes care for the sickness or injury for which the plan of treatment is being

---

[4] There is only one subsequent ruling from the Sixth Circuit Court of Appeals that relies on this portion of *Cooper*. In *Huffaker v. Metro Life Ins. Co.*, 271 Fed. Appx. 493, 500 (6th Cir. 2008), the court found a plan administrator's demand for objective evidence reasonable due to the plan's requirement that a claimant "prove inability to 'perform all the material duties of his or her Regular Occupation'" in order to receive LTD benefits.

developed and must, in the event of any behavioral health problem, be a behavioral health specialist.

(AR at p. 1126.)

Paragraph V(B) of the Plan provides that STD benefits will commence when a "physician [certifies] the nature of the condition, illness or injury and the length of time the participant is expected to be absent from work." (AR at p. 1127) The Plan also reserves the right to require a "physical examination or periodic reports from the participant's attending physician . . . or to seek an examination of a participant by a company-selected physician before payments . . . begin or are continued." The Plan further provides that STDs will be reduced "by the amount of any benefits the participant receives under worker's compensation laws and/or state disability laws.

(AR at p. 1127-28)

Contrastingly, as in *Cooper*, the terms governing LTD benefits under the Plan provide that a claimant is disabled:

> when, due to a *medically determinable* physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than six months. Additionally, all of the following conditions must be satisfied to fall within the definition of a Disability that would entitle a participant to receive a benefit under the LTD Program: (a) for the first year that benefits are payable under the LTD program, the disabling condition must render the person unable to perform the material and substantial duties of his or her occupation; (b) after such one year period, the disabling condition must render the person unable to perform the material and substantial duties of any job for which the person is reasonably fitted considering education, training and experience; (c) the person is not working, including self-employment, at any job for wages or profit (unless as expressly authorized pursuant to the rehabilitation rules of this Plan); and (d) at all times the person must be under the regular care of an Approved Treatment Provider as defined in Appendix A.

(AR at p. 1126.)

Disabilities that result from "suicide or other self-inflicted injuries" are excluded from the Plan, as are those injuries sustained "from taking part in, or as a result of taking part in committing an assault or felony." (AR at pp. 1126-27.) The Plan also requires a claimant to

"*submit proof* that the participant continues to be Disabled," undergo examination "by a doctor of the Plan's choosing and at the cost of the Plan" in order to begin or continue receiving LTD benefits. (AR at p. 1133.) In addition to these requirements and exclusions, the Plan requires that a claimant pursue Social Security Administration Disability ("SSD") benefits and claims an offset in disability payments for any SSDs received. (AR at p. 1129) Further, the Plan subrogates itself to any right a claimant has to recompense for a disability from any other source and demands repayment/reimbursement of benefits paid. (AR at p. 1130)

Giving effect to the clear meaning of the Plan's terms and taking them in context, Aetna's requirement for "measurable examination findings and diagnostic test results that would substantiate an inability to perform [her] own occupation" is an extra-contractual requirement. (Motion at p. 64.) *See Lipker v. AK Steel Corp.*, 698 F.3d 923, 928 (6th Cir. 2012) (noting that interpretation of "ERISA plan provisions [is governed by] general principles of contract law."). The Plan terms clearly indicate a lower threshold of "proof" necessary to establish entitlement to STD benefits—a "physician['s certification of] the nature of the condition, illness or injury and the length of time the participant is expected to be absent from work." (AR at p. 1127.) Even were the intent not plainly apparent, the requirement for proof of a "medically determinable physical or mental illness" within the context of the LTD program and the exclusion of an analogous provision in the STD program weighs against superimposition of the more restrictive terms over those contained within the STD program.

As such, Gannett's requirement for objective medical evidence is a "new requirement for coverage [] added to those enumerated by the Plan," which renders that denial arbitrary and capricious  *Burge v. Republic Engineered Prods.*, 432 Fed. Appx. 539, 550 (6th Cir. 2011) (citing *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Alabama*, 41 F.3d

1476, 1484 (11th Cir. 1995)), *see also Cooper*, 486 F.3d at 170 (holding that failure to notify a claimant that only one form of evidence is acceptable for benefit determination purposes is arbitrary and capricious). While this finding is sufficient, the other factors Ms. Sisk cites also weigh in her favor.

**B. Aetna's reliance on the opinions of independent reviewing physicians.**

Ms. Sisk argues that Aetna's denial of her benefits without evidence of improved medical condition was inherently arbitrary. (Motion at p. 65) Gannett responds that there is nothing "inherently arbitrary and capricious" when a claims administrator relies "on independent physicians' review of records as opposed to Plaintiff's treating physician." (Response at p. 22) While this is certainly true, Aetna's initial denial of Ms. Sisk's claims was not made on the basis of an independent review. *See Calvert v. Firstar Fin. Inc.*, 409 F.3d 286, 296-97 (6th Cir. 2005) (holding "there is nothing improper with relying on a file review" during the benefit determination process).

From July through October of 2008, Aetna approved Ms. Sisk's STDs based *exclusively* upon the opinions of her treating physicians. At no time during the period were "measurable clinical findings and laboratory test results" present in the record to support those benefits, and Aetna had not sought a contrary opinion from another source as the Plan provides. (AR at p. 901-02.) Indeed, Aetna's chief nurse consultant approved Ms. Sisk's benefits on November 11th based upon Dr. Bertrand's certification only to have a claims analyst, who possesses no apparent medical training or specialization, overturn that decision based upon the lack of objective medical evidence.

Contrary to that determination, however, Dr. Bertrand's observations of "fatigue and word-finding difficulties," his examination results revealing 12 of 18 tender points, the various

blood tests showing no medical reason for Ms. Sisk's symptoms, and his ultimate opinion are reliable objective medical evidence of CFIDS recognized by the CDC. Aetna's failure to credit Dr. Bertrand's opinion without "seek[ing] an examination . . . by a company-selected physician" as the Plan allows, weighs in favor of finding that denial arbitrary and capricious. *See Black & Decker Disability Plan v. Nord*, 538 F.3d 822, 834 (2003) (holding that plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians."), *Helfman v. GE Group Life Assur. Co.*, 573 F.3d 383, 395-56 (6th Cir. 2009) (holding "when an administrator exercises its discretion to conduct a file review, credibility determinations made without the benefit of a physical examination support a conclusion that the decision was arbitrary.").

Also contrary to Gannett's claims, Aetna's reliance on the opinions of its independent experts during the appeal process renders the initial denial no less arbitrary. Reliance on an independent physician's review of a medical record is reasonable only where that review is not "clearly inadequate," *Calvert*, 409 F.3d 296, when viewed "with some [degree of] skepticism." *Evans*, 434 F.3d at 878 (quoting *Moon v. UNUM Provident Corp.*, 405 F.3d 373, 381-82 (6th Cir. 2004)). One measure of adequacy is whether the reviewer made "critical credibility determinations regarding a claimant's medical history and symptomology," (*Calvert*, 409 F.3d at 297), or discredited a claimant's "self-reported occurrences" without the benefit of performing an exam of the claimant. *Evans*, 434 F.3d at 879. The record clearly reflects that both Dr. Bertrand's observations and credibility determinations, as well as Ms. Sisk's substantive complaints, were disregarded without a physical examination. Thus, Aetna's denial of Ms. Sisk's benefits based upon their opinions supports the conclusion that Aetna's conduct here was arbitrary and capricious.

A more important measure of whether an independent physician's review of a medical file is adequate is whether the explanation offered by the reviewer is "consistent with the quantity and quality of the medical evidence that is available on the record," *Id.* at 878 (quoting *McDonald*, 347 F.3d at 172), or whether the reviewer "cherry-picked" the file to support an unfavorable decision. *Id.* at 879 n. 5 (citing *Spangler v. Lockheed Martin Energy Sys.*, 313 F.3d 356, 362 (6th Cir. 2002)). In Ms. Sisk's case, the opinions of Aetna's independent reviewers are not consistent with the record, are internally inconsistent in some instances, and are certainly not reflective of the quantity and quality of the record evidence.

First, the Magistrate Judge notes that none of the reviewers possessed any "specialty or expertise" in chronic diseases such as CFIDS or CFS, which is required under the Plan. (AR at p. 1128) Relatedly, each of Aetna's reviewing experts tailored their opinions to exclude consideration of CFS/CFIDS which was Dr. Bertrand's ultimate diagnosis. Dr. Zide's opinion was limited to limitations resulting from "infectious disease" (AR at p. 296), Dr. Mendelssohn deferred to other specialists as to the impact of CFS or CFIDS and limited her assessment to "a neuropsychological perspective" (AR at p. 532), and Dr. Bowman deferred to Dr. Mendelssohn on Ms. Sisk's cognitive status and limited her opinion to "an internal medicine standpoint." (AR at p. 1245)

Most importantly, each of the experts formed their opinions without having access to the complete medical record or cherry picked medical evidence to support Aetna's denial of Ms. Sisk's claims. Dr. Zide, after noting the need for a neuropsychological exam, was never provided a copy of the results of Dr. Terrell's examination and discounted the reports of Ms. Sisk's cognitive impairments due to the quality of Ms. Sisk's letters and speculation that she could drive. (AR at p. 296) Further, after acknowledging Dr. Bertrand as an expert in chronic

illnesses and the correctness of a diagnosis in the absence of discrete clinical findings, Dr. Zide offered an inconsistent functional analysis due to a lack of adverse clinical findings. (AR at p. 296) Likewise, as noted *supra* at pp. 13-14, Dr. Bowman's opinion was based upon a "lack of clinical findings to support the need for restrictions" only after deferring to Dr. Mendelssohn as to any cognitive impairments that Ms. Sisk might exhibit due to CFIDS. (AR at p. 1245)

Although Dr. Mendelssohn references the neuropsychological examination findings of Dr. Terrell, the record indicates that the report itself was not included in her peer review, nor were any of Ms. Sisk's medical records subsequent to December of 2008. (AR at pp. 526-29) Further indicating that Dr. Mendelssohn was not provided the full copy of Dr. Terrell's report are her erroneous observations regarding Ms. Sisk's exhibited behavior and the results of the testing performed. For example, Dr. Mendelssohn's opinion relies in part on Dr. Terrell's failure to "include a description of direct and observed behaviours to corroborate" his conclusions. (AR at p. 531) Yet, as noted *supra* at pp. 9-10, Dr. Terrell clearly included his observations of Ms. Sisk's cognitive deficiencies and the impact of fatigue as testing wore on.

Dr. Mendelssohn observation that there was a lack of "formal measures of symptom validity, memory, language, visual-spatial ability, or executive functioning," is belied by Dr. Terrell's detailed analysis of Ms. Sisk's intellectual functioning through a comparison of specific scaled scores in memory, visual-spatial ability, and executive function. (AR at p. 183-84) Most notable, however, is Dr. Mendelssohn failure to discuss or refute the conclusions drawn by Dr. Terrell from Ms. Sisk's test performance.

Thus, the opinions of Aetna's independent file reviewers are "clearly inadequate" to support Aetna's denial of Ms. Sisk's STD claims. *Evans*, 434 F.3d at 878 (quoting *Calvert*, 409 at 419).

### C. Aetna's Disregard of Ms. Sisk's Favorable SSD Ruling

Lastly, Ms. Sisk asserts that Aetna arbitrarily failed to afford any weight to the favorable SSD ruling. (Motion at p. 67.) Gannett responds that approval of SSD benefits is not dispositive and does not obligate a finding of disability under the Plan. (Response at pp. 20-21.) Further, Gannett asserts that Aetna's decision to afford the SSD ruling insignificant weight is justified due to the fact that:

> [Aetna's] disability determination and the SSD determination are made independently and are not always the same. The difference between our determination and the SSD determination may be driven by the Social Security Administration (SSA) regulations. For example, SSA regulations required that certain disease/diagnoses or certain education or age levels be given heavier or even controlling weight in determining whether an individual is entitled to SSD benefits.

(AR at p. 906.)

However, this statement does little to "explain why [Aetna was] taking a position different from the SSA on the question of disability" as it was required to do after requiring Ms. Sisk to seek SSD benefits and standing to benefit from them. *Delisle v. Sun Life Assur. Co.*, 558 F.3d 440, 446 (6th Cir. 2009) (relying on *Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 554 (6th Cir. 2008)). As such, Aetna's treatment of the favorable SSD ruling supports a finding that Aetna's denial of Ms. Sisk's benefits was arbitrary and capricious.

### D. Ms. Sisk's Entitlement to LTD Benefits Under the Plan

Ms. Sisk maintains that the Plan anticipates the "roll over" of STDs into LTDs where a disability persists for longer than 26 weeks. Thus, Aetna's denial of her claim to STD was a *de facto* denial of any claim she may have to LTDs. (Motion at p. 64) Despite arguing that Ms. Sisk never applied for LTD benefits, Gannett concedes Ms. Sisk's point in its claims that her "STD claim was terminated before her LTD claim ever arose. Therefore, there was no way for her STD claim to 'roll over' into an LTD claim." (Response at 23)

Under the terms of the Plan, Dr. Bertrand's certification of the nature of Ms. Sisk's illness and the duration of her inability to work entitled her to STDs *unless* Aetna sought an examination of Ms. Sisk by a company-selected physician. (AR at pp. 1127-28) Thus, had Aetna not arbitrarily denied Ms. Sisk's STD benefits, her claims would have "rolled over" as she claims. However, while Ms. Sisk is clearly entitled to the short term disability benefits denied her by Aetna's arbitrary decision, the Plan administrator has not been afforded the opportunity to rule on Ms. Sisk's entitlement to LTD benefits.

Further, the standard for determining Ms. Sisk's entitlement to LTD benefits is significantly different than that for STD's, and the record is wholly insufficient for such a determination here. Thus, remand to the Plan administrator is warranted for development of the record and a decision by the Plan administrator on this issue. *See generally Shelby County Health Care Corp. v. Majestic Star Casino, LLC Group Health Benefit Plan*, 581 F.3d 355 (6th Cir. 2009).

## CONCLUSION

For the reasons set forth above, the Magistrate Judge finds that Aetna was not the Plan Administrator for the Gannett Company, Inc. Income Protection Plan at the time it denied Ms. Sisk's claims for short term disability payments. As such, *de novo* review of Aetna's decision is appropriate. *See Sanford v. Harvard Indus.*, 262 F.3d 590, 597 (6th Cir. 2001).

The Magistrate Judge also finds Aetna's denial of Ms. Sisk's claims to have been conducted in an arbitrary and capricious manner. Aetna's requirement for "measurable examination findings and diagnostic test results that would substantiate an inability to perform [her] own occupation" is a "new requirement for coverage" that was not provided for or anticipated by the Plan. *Burge v. Republic Engineered Prods.*, 432 Fed. Appx. 539, 550 (6th Cir.

2011) (citing *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Alabama*, 41 F.3d 1476, 1484 (11th Cir. 1995)).

Further, Aetna's imposition of this requirement without seeking an outside consult as the Plan requires supports this conclusion. So too does the conduct of Aetna's independent reviewing physicians during the appeal process. The opinions of these physicians evidence a lack of a "deliberate, principled reasoning process." *Glenn*, 461 F.3d 666. In reaching their conclusions regarding Ms. Sisk's functional abilities, they disregarded of the opinions and credibility assessments of Ms. Sisk's treating physicians without conducting an independent examination of Ms. Sisk, they disregarded Ms. Sisk's subjective complaints without conducting an independent examination, and they gave inadequate treatment to medical evidence of record.

Additional support is found in Aetna's failure to credit to the favorable Social Security Administration ruling in its consideration of Ms. Sisk's appeal, and its failure to distinguish that favorable ruling from Aetna's unfavorable ruling.

Lastly, the Magistrate Judge finds that the record is incomplete with respect to Ms. Sisk's long term disability benefits.

## **RECOMMENDATION**

The Magistrate Judge **RECOMMENDS** that Ms. Sisk's motion for judgment on the administrative record be **GRANTED in PART** in that she be awarded the short term disability benefits, as well as any other appropriate relief, she was denied by Aetna's unreasonable consideration of her claims. Further, the Magistrate Judge **RECOMMENDS** that Ms. Sisk's motion be **DENIED in PART** and the case remanded to Gannett for consideration of Ms. Sisk's entitlement to long term disability benefits under the Plan.

The parties have fourteen (14) days of being served with a copy of this Review and Recommendation to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this Review and Recommendation may constitute a waiver of further appeal. *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012) (citing *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986)).

**ENTERED** this 21ᵗʰ day of April, 2014.

/s/Joe B. Brown_____
Joe B. Brown
Magistrate Judge